Donald W. Hudspeth (012198)
Mark S. Hamilton (033825)
**LAW OFFICES OF DONALD W. HUDSPETH, P.C.**
3200 N. Central Avenue, Suite 2500
Phoenix, Arizona 85012
Telephone: (602) 265-7997
Facsimile: (602) 265-6099
Email: Don@azbuslaw.com
Email: Court@azbuslaw.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SINGLEPOINT DIRECT SOLAR LLC, PABLO DIAZ, JAGUSA HOLDINGS, INC., DAN SHIKIAR, ELIJAH LEE CHAFFINO, and KJELSEY JOHNSON, <br><br> Plaintiffs, <br><br> v. <br><br> SINGLEPOINT INC., GREG LAMBRECHT, WIL RALSTON, AND COREY LAMBRECHT, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR:** <br> 1. **VIOLATION OF FEDERAL AND ARIZONA SECURITIES LAW** <br> 2. **FRADULENT SCHEME AND ARTIFICE TO DEFRAUD** <br> 3. **BREACH OF FIDUCIARY DUTY** <br> 4. **BREACH OF CONTRACT** <br> 5. **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING** |

For their Complaint against Defendant SinglePoint Inc, Greg Lambrecht, Wil Ralston, and Corey Lambrecht ("Defendants"), Plaintiff's SinglePoint Direct Solar LLC, Pablo Diaz, Jagusa Holdings, Inc., Dan Shikiar, Elijah Lee Chaffino, and Kjelsey Johnson ("Plaintiff's") alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. This court has jurisdiction and 28 USC £1331 and supplemental jurisdiction over any state law claims that are included in this Complaint.

2. This case involves on ongoing scheme of acquiring a controlling interest in privately owned businesses by promising the company owners funding for expansion and acquisitions,

issuing press releases to tout the acquisitions, and boost the price and sell the Defendant's publicly traded shares, but reneging on the promises and looting the company.  As the new majority owner and Manager(s) the Defendants owed a fiduciary duty to the companies acquired but breached this duty by among other things having the officers and directors of the parent serve as management of the acquisition and using their dual roles as managers to act for the benefit of SinglePoint and its officers and directors to the serious and permanent detriment of the companies acquired.

3. Plaintiff SinglePoint Direct Solar LLC ("Direct Solar") is a Nevada limited liability company owned 51percent by SinglePoint Inc. and 45 per cent by Plaintiff Pablo Diaz Curiel ("Diaz") and 45% by Kjelsey Johnson. Direct Solar's claim is derivative based on demand made by Pablo Diaz to the majority Managers on behalf of the company on or about March 16, 2021.

4. Plaintiff Pablo Diaz ("Diaz") is a resident of Maricopa County Arizona

5. Plaintiff JAGUSA Holdings, Inc. is a Colorado corporation doing business in Arapahoe County and owner of 49% of the shares of the now defunct Jiffy Auto Glass USA and 49% of the shares of ShieldSaver.

6.  Plaintiff Dan Shikiar is a Colorado resident living in Arapahoe County, Arizona and the 100% shareholder of JAGUSA Holdings Inc.

7.  Plaintiff Elijah Lee Chaffino resides in Maricopa County, Arizona and is the owner of Sun UP solar and Standard Eco.

8. Kjelsey Johnson("Johnson") resides in Maricopa County, Arizona and is, a member of SinglePoint Direct Solar LLC.

9. Defendant SinglePoint, Inc., is a publicly traded corporation regulated by the U.S. Securities and Exchange Commission and incorporated in a Nevada corporation, Defendants Greg Lambrecht and Wil Ralston, are two of SinglePoint's shareholders, at the pertinent time were its Directors, President and Officer, and who also served as two of the three Direct Solar Managers.

10. Defendant C. Lambrecht is now President of SinglePoint and a Manager of Direct Solar.

## GENERAL ALLEGATIONS
### Pablo Diaz and Direct Solar

11. Direct Solar was formed on or about May 15, 2019, with SinglePoint, Diaz and Johnson as members. Diaz had a pre-existing and profitable company, Direct Solar LLC, a Delaware limited liability company ("DSA").

12. Due to his experience and recognition in, and knowledge of, the solar industry Diaz on behalf of DSA was able to find, negotiate, and consummate more than $200,000,000 in solar industry related transactions.

13. As stated below Diaz has consummated more than $11,000,000 in Direct Solar sales in the one year since its Acquisition.

14. But DSA lacked the capital to fund transactions and grow the company.

15. Diaz friends, Greg Lambrecht ("Lambrecht") and Wil Ralston ("Ralston") owned and operated the company SinglePoint Inc. which shares trade on the public "penny stock" market.

16. SinglePoint's access to capital through the public market could provide DSA with the capital it needed;

17. Together, the Lambrecht, Ralston and Diaz prepared a Capital Flow Statement which showed the capital needed and growth and profits expected.

18. Due to the delay in the solar industry between the solar equipment sale, installation, and collection, the parties understood that SinglePoint would need to fund Direct Solar for at least two "tranches" of 90 days each. During the second tranche Direct Solar could become self-funding. Lambrecht and Ralston understood this and the Capital Flow Statement, reflects this understanding and plan, as does Diaz Employment Agreement.

19. On that basis, i.e., SinglePoint providing capital for acquisitions, Diaz agreed to do an asset sale of DSA to SinglePoint. A copy of the Asset Purchase Agreement dated February 22, 2019.

20. Lambrecht, Ralston and Diaz had the Capital Flow Statement with and in front of them when they signed the Asset Purchase Agreement.

21. In May 2019 SinglePoint and Diaz formed a new Nevada company, SinglePoint Direct Solar, LLC ("Direct Solar").

22. On May 15, 2019, SinglePoint and Diaz signed the SinglePoint Direct Solar Operating Agreement.

23. On or about the same date of May 15, 2019, Direct Solar and Diaz entered into an Employment Agreement.

24. This Agreement had as an attachment, referred to and incorporated an aggressive bonus compensation program based on revenues generated.

25. But in the Operating Agreement, SinglePoint agreed to fund only the first tranche of $250,000 and conditioned future investment on earnings of and distributions by Direct Solar ("Condition"). Basically, this meant that except for the first $250,000 Direct Solar would only have funds for acquisitions if Direct Solar generated the earnings and that SinglePoint 51% distribution would be sufficient.

26. This Condition to funding is inconsistent to the Capital Flow Statement upon which the Acquisition was based. And it is inconsistent with the Bonus System of the Employment Agreement which was signed on the same day as the Operating Agreement was signed.

27. This Condition to funding was never a part of the Acquisition or Employment.

28. But for the promise of funding Diaz would not have sold the original Direct Solar, i.e., DSA to SinglePoint. With the Condition to funding the Acquisition made no sense to/for Diaz for several reasons:

> One, the parties' own Capital Flow Statement, relied on by Diaz when he sold DSA, showed this Condition would not work – Direct Solar needed at least two tranches of funding- and that the parties (not just Diaz) knew that it would not work.

> Two, it put Diaz/Direct Solar in the "Catch 22" position of needing Direct Solar earnings for growth, but not having the capital to generate those earnings,

Three, if Direct Solar had to fund its own operations and acquisitions, then Diaz was in the same position as before the Acquisition, i.e., using Direct Solar funds for operations (if you want) acquisitions. There is no reason why Diaz would do that.

Four, not only would Diaz still be using Direct Solar funds to fund acquisitions he would now only benefit as a 45% owner, instead of the 100% owner. Again, this makes no sense. (These points become important in our claim for Constructive Fraud.)

29. Direct Solar had a major acquisition pending, Soligent, which Diaz introduced to Lambrecht and Ralston as SinglePoint's majority owners, directors, and officers.

30. Not only did SinglePoint not fund this acquisition – which it could have through sale of shares, as it had with other acquisitions, it demanded that Diaz use his SinglePoint shares to fund the acquisition. The effect of this would be that not only would Diaz no longer be a Single Point shareholder, but he would have used his shares to buy a company that SinglePoint would own 51% of. And again, that proposal made no sense, if Diaz were to use his own money to fund an acquisition, he had no reason to sell the assets of his original Direct Solar. Moreover, this proposal completed ignored the new Direct Solar. Direct Solar would play no role in this acquisition. (Basically, this was a scheme of corporate "squeezeout.")

31. Diaz on behalf of Direct Solar spent time and money lining up potential acquisitions. These companies were interested in being acquired by or doing deals with Direct Solar.

Companies for which Diaz and had done the leg work and negotiated the terms of the deal included:

- Eco Management
- Stellar Solar a subsidiary of Soligent Holdings
  a.     Soligent. 41 years old, and the largest distributor of solar material in the nation. Revenue streams of $100's of millions in revenue yearly
- Sun Up Solar LLC
- SVG Solar
  a.     The company could bring 100+ sales teams. Immediately doubling revenue for DSA and shareholders.

Also, pending is the final presentation to a South Carolina School District to put solar in 35 schools. Initial funding for this project is $7,000,000 with expected revenues of

$70,000,000. SinglePoint is attempting to take this contract at the last minute. In doing so it has followed its standard procedure of disparaging Pablo Diaz, but to people who know Diaz well.  The expected outcome is loss of the contract.

32. But without funding Direct Solar could not complete these transactions.

33. When presented with these candidates for acquisition, SinglePoint demurred or attempted to go direct and squeeze Direct Solar out of the deal. Examples of this include:

(a) a text from C. Lambrecht to Diaz that SinglePoint was going to do the Soligent acquisition, a large and important transaction, directly without Direct Solar. (Soligent is the largest materials supplier in the solar industry). This is after Diaz established the relationship, set up the deal, set up the meeting and introduced Greg Lambrecht and Wil Ralston to Soligent's management and the transaction. And,
(b) After being introduced to the principal of Eco Management, setting up another meeting without Diaz in which they bad-mouthed Diaz and offered to do the deal directly. This created further conflict between Diaz and SinglePoint and Diaz and the seller because the principal of Eco Management is Diaz brother.

34. By taking Direct Solar out of the deal, Direct Solar did not get its 45% of the profits, Diaz and Kjelsey Johnson did not get their distributions, and Diaz did not get his employment bonus.

35. In another act inconsistent with its deal with Diaz, and detrimental to Direct Solar, SinglePoint has formed a new company, Single Solar, to perform tasks similar to Direct Solar and has appointed C. Lambrecht as SinglePoint's point man for acquisitions. This shows a clear intent to divert transactions away from Direct Solar in derogation of its business and Diaz Employment Agreement and the fiduciaries duties of the protagonists, as discussed below.

36. Diaz compensation under the Bonus Program was based on revenues generated.

37. As of May 15th, 2019 - May 15th, 2020, over a one-year period Diaz had generated $11,122,273.90.

38. As shown by the Calculation of Bonus Plan Compensation set forth, Diaz earned about $506,000 in compensation. This promised bonus compensation has not been paid.

39. The subsidiary SinglePoint Direct Solar LLC operates under the name SinglePoint. Lambrecht and Ralston who are the majority owners, director, and President of

SinglePoint also serve and control Direct Solar's as its majority Managers. The same persons serve as the management of both SinglePoint and Director Solar.

40. Direct Solar is at or near insolvency because SinglePoint has not funded the Company, has attempted to divert its opportunities, and has taken Direct Solar's PPP funds without any legal justification. This latter move is arguably a fraudulent transfer as to Direct Solar's creditors and it is a decision that Diaz did not make and has expressed strong objections. (It may also violate federal law.)

41. On or about May 27, 2021, SinglePoint sent notice to Diaz and the Direct Solar employees that Diaz Employment Agreement would not be renewed and that his employment with the company had been terminated.

42. This termination occurred in spite of the fact, or because, on or about March 26, 2021, Diaz sent a letter advising SinglePoint that the company and its officers and directors were committing at least the following statutory violations:

   a.  Breach of ARS £29-3409 fiduciary duty.

   b.  Breach of ARS 23-353 payment of wages.

   c. Apparent violation of the Penny Stock Reform Act, of the "Securities Enforcement Remedies and Penny Stock Reform Act of 1990 in the manipulation of share price and transactions.

   d. Violation of the CARES Act by usurping PPP funds for which Direct Solar applied and only Direct Solar was qualified.

43. SinglePoint acquired a 51% majority stake in Jiffy Auto Glass in October 2017.

44. SinglePoint acquired a 51% majority stake in ShieldSaver in January 2018.

45. Before and in both acquisitions SinglePoint promised to fund the companies.

46. On or about January 2018 SinglePoint took control of the bookkeeping and accounting for Jiffy Auto Glass, bogusly citing as a reason their fiduciary duty to the company to do so but thereby admitting a fiduciary duty.

47. In late August/early September 2018 SinglePoint stopped funding ShieldSaver, despite numerous verbal commitments from Greg Lambrecht to do so.

48. This left ShieldSaver without cash to cover payroll for Plaintiff Dan Shikiar and COO John Nemmer.

49. On or around January 2019 SinglePoint stopped paying the bills. This left the company Jiffy Auto Glass without money to pay $21,000 owed for glass to its glass supplier Mygrant Glass.

50. SinglePoint's actions as management left Jiffy Auto Glass unable to operate, insolvent and unable to pay its primary vendor, Mygrant Glass.

51. Jiffy had access and use of the SinglePoint credit card which it had used before without objection and used it to pay this essential bill. (Jiffy Auto Glass could not operate without a glass supplier.)

52. SinglePoint, contrary to its promise of funding, later contested this basic operations charge and had this and about $40,000 in other charges reversed. Mygrant Glass is now suing Jiffy Auto Glass for this amount.

53. SinglePoint did not pay or as majority owner cause Jiffy Auto Glass to other bills. SinglePoint and Shikiar are now personally liable on these debts to creditors.

54. As the party in charge of the books and accounts (by its demand as stated in paragraph number 47) and majority owner SinglePoint is the tax matters representative personally liable on these unpaid taxes.

55. In the attempt to escape the sale tax and other liability Greg Lambrecht and Wil Ralston repeatedly demanded that Plaintiff Dan Shikiar take back SinglePoint's shares of Jiffy Auto Glass in trade and turnover his 49% ownership in ShieldSaver. Shikiar refused.

56. In July 2020 Greg Lambrecht and Wil Ralston went to Wells Fargo and withdrew all monies in both the Jiffy Auto Glass and the ShieldSaver bank accounts. Bank Statements showing zero balance for Jiffy Auto Glass and ShieldSaver after withdrawal.

8

57. On July 26, 2020, Wil Ralston filed Articles of Dissolution of Jiffy Auto Glass LLC but did so without Dan Shikiar's consent and *forged Dan Shikiar's signature on the dissolution filing.*

**Factual Allegations**
**Elijah Lee Chaffino Relating to SinglePoint Acquisitions**
**of Sun Up Solar and Standard Eco**

58. Re Sun Up Solar: Lambrecht and Ralston as SinglePoint's officers and directors and as Managers of Direct Solar purchased 51% of Chaffino's company, Sun Up Solar. (This was done without any meeting or notice thereof to the third Direct Solar Manager, Pablo Diaz.)

59. Ralston, Greg Lambrecht, and C. Lambrecht, without Chaffino's knowledge or approval, incorrectly and improperly added themselves personally as members of the company in the official public records of the Arizona Corporation Commission. (This would have required notice, a meeting, a vote, and unanimous consent, none of which happened.)

60. As this was a Direct Solar merger of 51% of Sun Up Solar, *Direct Solar*, not its managers, would be listed as the member of the Company.

61. Wil Ralston opened a Sun Up Solar bank account. Again, this was incorrect and improper because Wil Ralston was not a party to the Sun Up Solar transaction and no document states that he would open or be added to a Sun Up Solar account.

62. As it did with Diaz, SinglePoint promised that it would cause Sun Up Solar to pay bonuses for achieving certain milestones.

63. Chaffino has earned $80,000 in bonus pay for accomplishing milestones per the contracts that SinglePoint created.

64. Chaffino has not been paid these commissions.

65. Re Standard Eco: SinglePoint and Chaffino discussed a merger or acquisition of Chaffino's company, Standard Eco.

66. But this transaction did not close. No agreement was made. Nothing was ever signed.

67. Nevertheless, on or about July 29, 2020, SinglePoint issued at least two press releases in which it announced that Direct Solar of America has acquired Standard Eco.

68. These false announcements have caused confusion and damages in the market place.

## COUNT ONE

## SECURITES FRAUD

70. Plaintiff re-allege the allegations of paragraphs one - sixty-nine (1-69) as if set forth in this count One.

71. In their Acquisitions of DSA, Jiffy Auto Glass, Shield Saver, and Sun Up Solar Defendants SinglePoint, Lambrecht and Ralston were the actual persons who made the material and false representations of promised funding for expansion. These Defendants were the control persons under Section 2 of the Securities and Exchange Act of 1934 (the "Exchange Act").

72. Plaintiffs Diaz, Shikiar and Chaffino justifiably relied on these promises in deciding to sell a controlling interest of their companies to SinglePoint.

73. Each of these Acquisitions involved an investment contract, which is a security under Arizona law. Rule 10b-5 of the federal Securities Exchange Act of 1934 prohibits the use of a scheme to defraud, or material misstatements or omissions related to the purchase or sale of securities.

74. Plaintiffs have a private cause of action for securities fraud under Section 10b-5 of the Exchange Act and under A.R.S. § 13-2314.04 involving the sale of securities pursuant to (A.R.S. § 44-1991) (the shares of stock or membership interests in the plaintiff companies are securities), intentional or reckless sale of unregistered securities or real property securities (A.R.S. § 44-1841), a scheme or artifice to defraud (A.R.S. § 13-2310).

75. Defendants knew their statements relating to the purchase and sale of securities were false when made.

76. Contrary to its promises SinglePoint did not fund the companies; rather, it took their available cash, and failed to pay sales tax due, glass suppliers, other bills.

77. Basically, contrary to promises made, the companies were looted of their available cash and left insolvent.

78. In addition, with both Pablo Diaz and Dan Shikiar Defendant Lambrecht discussed various stock manipulation schemes, including the use of relatives, press releases, and coordinated buying and selling. Upon information and belief the sale of SinglePoint securities, rather than earnings, was the primary source of personal income for the individual Defendants. These actions violate the Penny Stock Reform Act, of the Securities Enforcement Remedies and Penny Stock Reform Act of 1990.

WHEREFORE, Plaintiffs request that judgment be entered in their favor, and against Defendants SinglePoint, Lambrecht, Ralston and C. Lambrecht, jointly and severally as follows:

   A.   For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

   B.   For punitive damages in an amount to be proven at trial;

   C.   For plaintiffs' costs and attorney's fees incurred herein; and

   D.   For such other and further relief as the Court deems just and proper

### COUNT TWO

### SINGLEPOINT'S BREACH OF FIDUCIARY DUTY TO DIRECT SOLAR BY TAKING OR INTERFERING WITH DIRECT SOLAR ACQUISITIONS

79. Plaintiffs incorporate paragraphs one-seventy-eight (1-78) as if fully stated in this Count Two.

80. Single Point has a 51% membership interest in Direct Solar.

81. As a 51% active member SinglePoint owes a fiduciary duty under Arizona law to the company Direct Solar.

82. Greg Lambrecht as sole Director and Wil Ralston as President of SinglePoint who the majority of Managers of Direct Solar were also and are in a direct conflict of interest.

83. SinglePoint has breached this fiduciary duty of care and loyalty, among other ways, by diverting or attempting to divert deals and benefits away from Direct Solar to itself. This was a conflict of interest under Arizona law.

84. As a result of SinglePoint's refusal to fund Direct Solar and attempt to do the deal directly many of these deals have languished and opportunities have been lost.

WHEREFORE, Direct Solar requests the Court to enter judgment against Defendant SinglePoint, and award to Plaintiff Direct Solar

A. Damages of not less than $50,000

B. Punitive damages as appropriate

C. Attorney's fees and costs, and

D. Such other relief as the Court deems just and proper.

## COUNT THREE

### DIRECT SOLAR'S MANAGERS GREG LAMBRECHT AND WIL RALSTON BREACH OF FIDUCIARY DUTY TO DIRECT SOLAR

85. Plaintiffs reallege paragraph numbers one-eighty-four (1-84) as if fully set forth in this Count Three.

86. Greg Lambrecht as sole Director and Wil Ralston as President of SinglePoint and as the majority of Managers of Direct Solar were and are in a direct conflict of interest.

87. Under Arizona case law as two of the three Board of Managers of Direct Solar Greg Lambrecht and Wil Ralston owe a fiduciary duty to Direct Solar.

88. In the Operating Agreement Managers Lambrecht and Ralston agree in section 5.1(a) to "direct, manage, and control the business of the Company (Direct Solar) to the best of their ability." ... And, pursuant to section 5.1(c) they were to exercise their business judgment in managing the business and "*uphold any fiduciary duties imposed by Law...*" (Emphasis added). Arizona imposes a fiduciary duty on the managers of a limited liability company to the company and its members. ARS 29-3409(I)

89. Greg Lambrecht and Wil Ralston have breached their fiduciary duty to Direct Solar and its members, Diaz, and Johnson, as Direct Solar's Managers allowing SinglePoint to divert or

attempt to divert acquisitions and other transactions away from Direct Solar to SinglePoint (and as SinglePoint's management doing nothing to stop it.).

WHEREFORE, Direct Solar requests the Court to enter judgment against Defendants Lambrecht and Ralston and award to Plaintiffs Direct Solar, Diaz, and Johnson:

A. Damages of not less than $50,000

B. Punitive damages as appropriate

C. Attorney's fees and costs, and

D. Such other relief as the Court deems just and proper.

## COUNT FOUR

### MANAGERS GREG LAMBRECHT, C. LAMBRECHT, AND WIL RALSTON'S BREACH OF CONTRACT WITH DIRECT SOLAR, DIAZ, AND JOHNSON

90. Plaintiffs reallege paragraph numbers one-eighty-nine (1-89) as if fully set forth in this Count Four.

91. Under the company Operating Agreement, as quoted above, as Managers Greg Lambrecht and Wil Ralston agreed in section 5.1(a) to "direct, manage, and control the business of the Company (Direct Solar) to the best of their ability" ... They had the authority and duty to act as "reasonably required."

92. Managers Lambrecht and Ralston breached this Agreement by not acting to the best of their ability or as reasonably required for the benefit of Direct Solar. To the contrary Manager's Lambrecht and Ralston passively let SinglePoint act for itself to the detriment of Direct Solar.

93. As of January 2021, Corey Lambrecht ("C. Lambrecht") became President of SinglePoint and has replaced Greg Lambrecht as a Manager of Direct Solar.

94. After this change the wrongful acts of SinglePoint and the SinglePoint executives as Managers of Direct Solar have continued unabated.

95. As a result of Defendants failure to manage Direct Solar to the best of their ability Direct

Solar lost the income it otherwise would have earned from acquisitions and Diaz and Johnson lost the net income from their distributions.

WHEREFORE, Plaintiffs Direct Solar and Diaz request the Court to enter judgment against Defendants Lambrecht and Ralston, and award to Plaintiffs.

A. Damages of not less than $50,000

B. Punitive damages as appropriate

C. Attorney's fees and costs, and

D. Such other relief as the Court deems just and proper.

## COUNT FIVE

### SINGLEPOINT'S TORTIOUS INTERFERENCE WITH DIRECT SOLAR CONTRACTS AND BUSINESS RELATIONSHIPS

96. Plaintiffs reallege and incorporate the allegations of paragraphs one-ninety-five (1-95) as if fully set forth in this Count Five.

97. Diaz and Direct Solar had valid pending agreements and existing business relationships with, without limitation, the companies listed above as acquisitions.

98. SinglePoint knew of Direct Solar's relationships with these companies but attempted to freeze Direct Solar out of the deals and to induce the acquisition targets to do the deals directly.

99. SinglePoint did this for the improper purpose of maximizing gain to SinglePoint by eliminating distributions to Direct Solar as the other member, and depriving Diaz of his bonus compensation.

100. As a result, Direct Solar has lost millions in earnings and Diaz has lost his bonus incentive compensation.

WHEREFORE, Direct Solar requests the Court to enter judgment against Defendant SinglePoint, and award to Plaintiff Direct Solar

A. Damages of not less than $50,000

B. Punitive damages as appropriate

C. Attorney's fees and costs, and

D. Such other relief as the Court deems just and proper.

**COUNT SIX**

**SINGLEPOINT'S, LAMBRECHT'S, RALSTON'S AND C. LAMBRECHT'S BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING WITH DIRECT SOLAR AND DIAZ**

101.    Plaintiffs reallege and incorporate the allegations of paragraphs one-one hundred (1-100) as if fully set forth in this Count Six.

102.    Arizona implies the covenant of good faith into every contract in Arizona.

103.    The covenant of good faith requires the parties to act with honestly and fair dealing in transactions and not to act affirmatively to impair the other party's right to the benefits of the transaction.

104.    Defendants, and each of them, have breached the covenant of good faith and fair dealing by acting deliberately to deprive Direct Solar and Diaz the benefit of the Acquisition, monies that would and could be earned and paid as distribution to Direct Solar, then to Diaz and Johnson as members, and paid as bonus compensation under Diaz Employment Agreement.

WHEREFORE, Direct Solar and Diaz request the Court to enter judgment against Defendants SinglePoint, Lambrecht Ralston and C. Lambrecht as follows:

A. Damages of not less than $50,000

B. Attorney's fees and costs, and

C. Such other relief as the Court deems just and proper.

**COUNT SEVEN**

**BREACH OF PABLO DIAZ EMPLOYMENT AGREEMENT ATTRIBUTABLE TO SINGLEPOINT AND ITS MANAGEMENT**

105.    Plaintiffs reallege and incorporate the allegations of paragraphs one-one hundred four (1-104) as if fully set forth in this Count Seven.

106.    Direct Solar owes Diaz about $506,700 in bonus commissions and that number is increasing.

107.    This amount became due immediately upon Diaz termination on or about May 27, 2021, and if not paid by the next regular payday triple damages in the amount of $1,520,100.

108.    Direct Solar cannot pay this compensation due Diaz because of the intervening actions and control exercised by Lambrecht and Ralston as the management of both companies, including interference with acquisitions, operations and the taking of federal PPP funds from Direct Solar's account.

109.    By operating under the same name, with the same management, and whose actions have diverted Direct Solar opportunities and taken funds from its accounts SinglePoint has caused Direct Solar to become insolvent, insufficiently capitalized and deliberately thin in derogation of the rights of Direct Solar's creditors.

110.    As a result, Diaz has had to loan the company $150,000 to pay for operations, rent, bills and payroll.

111.    But for the actions by SinglePoint to subvert the efforts and take the opportunities and funds generated by Direct Solar, Direct Solar would have the funds to pay its debts, including the commissions due to Diaz and Diaz would not have had to fund the company.

112.    For the above reasons it would be inequitable for SinglePoint's corporate veil to shield and company and its officers and directors from liability, particularly on an employment compensation claim, on services that benefitted SinglePoint.

WHEREFORE, Diaz seeks judgment against Direct Solar and SinglePoint as

follows:

      A. Bonus commissions earned in the amount of $506,700 tripled to $1,520,100.

      B. Repayment of his loan to fund operations in the amount of $150,000

      C. Attorneys' Fees and Costs, and

      D. Such other relief as the Court deems just and proper.

## COUNT EIGHT

## VIOLATION OF STATE AND FEDERAL WHISTLEBLOWER STATUTES

113.   Plaintiffs reallege and incorporate the allegations of paragraphs one-hundred twelve (1- 112) as if fully set forth in this Count Eight.

114.   As delineated above in the Factual Allegations Diaz through counsel in March 2021 gave notice, advice, and warning ("Notice") to the officers and directors of Single Point and as Managers of Direct Solar that they had made and were continuing to make a number of statutory violations in addition to other instances of unlawful conduct.

115.   This Notice of statutory violations included the payroll claim, the PPP claim and alluded to the actions of such a serious nature that same would be discussed personally. These were the concerns about securities law violations.

116.   All of the above trigger whistleblower protection and statutory and civil penalties. And Plaintiff advised SinglePoint and its officers and directors of that point.

117.   Nevertheless, SinglePoint has acted to terminate Diaz' employment in obvious retaliation for acts by Diaz and the other Plaintiffs to alert SinglePoint's other directors and public shareholders of SinglePoint's unlawful acts and willful misconduct.

118.   Wherefore Diaz seeks the following statutory and civil damages:
     a. Per the Dodd-Frank Act. 15 U.S.C. £ 78u-6(h)(1)(B)(i).
        i. Reinstatement
        ii. Two times the back pay otherwise owed. With Az statutory penalties this amount would be $3,040,000.
        iii. interest, and

iv. costs and attorneys' fees

    b. Per Arizona Law

        i. Damages for wrongful termination of not less than $50,000

        ii. punitive damages

        iii. costs and attorney's fees, and

        iv. other relief the court deems just and proper.

## COUNT NINE

## DAN SHIKIAR BREACH OF CONTRACT CLAIM AGAINST SINGLEPOINT

119. Plaintiffs reallege and incorporate the allegations of paragraphs one-one hundred eighteen (1-118) as if fully set forth in this Count Nine.

120. SinglePoint told Dan Shikiar that it would fund the acquired companies, Jiffy Auto Glass and ShieldSaver.

121. The ShieldSaver Operating agreement states that SinglePoint would fund ShieldSaver.

122. SinglePoint did not fund the companies, did not pay the bills, and went to the bank to take the available cash of both companies.

123. SinglePoint breached its contracts with JAGUSA Holdings, Inc. by not providing the funding as promised.

    WHEREFORE, Plaintiff Dan Shikiar requests the Court to enter judgment against Defendant SinglePoint and award to Plaintiffs.

    A. Damages of not less than $50,000

    B. Attorney's fees and costs, and

    C.  Such other relief as the Court deems just and proper.

## COUNT TEN

## CHAFFINO CLAIM FOR TORTIOUS INTERFERENCE OF CONTRACT AGAINST SINGLEPOINT, LAMBRECHT, RALSTON AND C. LAMBRECHT

124.  Plaintiffs reallege the allegations of paragraphs one-one hundred twenty-three (1-123)

as if set forth in this Count Ten.

125.  By, among other things, wrongfully adding themselves personally to Sun Up Solar's LLC following Direct Solar's merger of Sun Up Solar, Defendants Lambrecht, Ralston and C. Lambrecht interfered with the true contract and business relationship of Direct Solar with the Company.

126. By incorrectly and improperly adding themselves to the Sun Up Solar's bank accounts and relationships these Defendants interfered with the company's bank accounts and bank relationships.

127.  By claiming to have acquired Standard Eco Defendants improperly caused confusion and interfered with Standard Eco's ability to do business with its customer, employees, and vendors.

WHEREFORE, Plaintiff Chaffino requests that judgment be entered in his favor, and against Defendants SinglePoint, Lambrecht, Ralston and C. Lambrecht, jointly and severally as follows:

A.     For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.     For punitive damages in an amount to be proven at trial;

C.     For plaintiffs' costs and attorney's fees incurred herein; and

D.     For such other and further relief as the Court deems just and proper

### COUNT ELEVEN

### CHAFFINO COMMISSION BONUS CLAIM

128.  Plaintiff Chaffino realleges the allegations of paragraphs one-one hundred twenty-seven (1-127) as if set forth in this Count Eleven.

129. Chaffino is due $80,000 in unpaid bonuses earned, but not paid.

130. With triple damages the amount due is $240,000

WHEREFORE, Plaintiff Chaffino requests that judgment be entered in his favor, and against Defendants Direct Solar and SinglePoint as follows:

      A.    For actual damages in the amount of $240,000;

      B.    For Plaintiffs' costs and attorney's fees incurred herein; and

      C.    For such other and further relief as the Court deems just and proper

**COUNT TWELVE**

**SHIKIAR, JIFFY AUTO GLASS, SHIELD SAVER, CHAFFINIO, SUNUP SOLAR AND STANDARD ECO CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST SINGLEPOINT, LAMBRECHT, RALSTON, C. LAMBRECHT AS MANAGERS**

131. Plaintiffs reallege and incorporate the allegations of paragraphs one-one hundred thirty (1-130) as if fully set forth in this Count Twelve.

132. As majority owner of the companies SinglePoint had a fiduciary duty to Jiffy Auto Glass and ShieldSaver.

133. As Managers of each company Defendants Lambrecht, Ralston and C. Lambrecht had a fiduciary duty to Jiffy Auto Glass and ShieldSaver.

134. Defendants SinglePoint, Lambrecht, Ralston and C. Lambrecht breached their fiduciary duties to the companies by acting out of self-interest for the benefit of SinglePoint rather than for Jiffy Auto Glass and ShieldSaver.   Such acts of self-interest include the taking of funds, the threat to shut down Jiffy Auto Glass and the unauthorized filing of dissolution papers for Jiffy auto Glass.

WHEREFORE, Plaintiff Dan Shikiar requests the Court to enter judgment against Defendant SinglePoint, Lambrecht, Ralston and C. Lambrecht and award to Plaintiff.

    A. Damages of not less than $50,000

    B. Attorney's fees and costs, and

    C.  Such other relief as the Court deems just and proper.

**COUNT THIRTEEN**

135. Plaintiff Shikiar realleges the factual allegations of paragraphs one – one hundred thirty-four (1-135) as if fully set forth in this Count Thirteen.

136. When Defendant Ralston filed dissolution papers for Jiffy Auto Glass LLC Plaintiff Shikiar became personally liable for all debts of the company including sales tax which SinglePoint did not pay.

WHEREFORE, Plaintiff Dan Shikiar requests the Court to enter judgment against Defendant SinglePoint and award to Plaintiff:

A. Damages equal to all sums for which Shikiar becomes personally liable as a result of Ralston's dissolution of the company.

B. Attorney's fees and costs, and

C.  Such other relief as the Court deems just and proper.

**COUNT FOURTEEN**

**SINGLEPOINT, LAMBRECHT, RALSTON'S AND C. LAMBRECHT'S ACTS OF CIVIL CONSPIRACY AGAINST DIAZ, DIRECT SOLAR, SHIKIAR, JIFFY AUTO GLASS, SHIELD SAVER, CHAFFINO, SUN UP SOLAR AND STANDARD ECO**

137. Plaintiffs reallege the allegations of paragraphs one-one hundred thirty-six (1-136) as if set forth in this Count Fourteen.

138. These Defendants acted unlawfully to divert ownership, earnings, and monies away from Plaintiffs Diaz, Direct Solar, Shikiar, Jiffy Auto Glass and ShieldSaver, Chaffino and Sun Up Solar.

139. The Defendants did so intentionally with the purpose of enriching themselves at the expense of and harm to Plaintiffs.

140. These were not isolated acts but a pattern and practice of conduct from 2017 to today.

141. As a result of these unlawful, concerted, and intentional acts ownership, income and funds were diverted from Plaintiffs causing great financial harm to them.

142. These acts constitute the tort of civil conspiracy.

WHEREFORE, Plaintiffs request that judgment be entered in their favor, and against Defendants SinglePoint, Lambrecht, Ralston, and C. Lambrecht jointly and severally, as follows:

A.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.      For punitive damages in an amount to be proven at trial;

C.      For plaintiffs' costs and attorney's fees incurred herein; and

D.      For such other and further relief as the Court deems just and proper.

**COUNT FIFTEEN**

**AIDING AND ABETTING: SINGLEPOINT, LAMBRECHT, RALSTON AND C. LAMBRECHT**

143. Plaintiffs reallege the allegations of paragraphs one-one hundred forty-two (1-142) as if set forth in this Count Fifteen.

144. SinglePoint, Lambrecht, Ralston and C. Lambrecht agreed and acted to divert by unlawful means funds which should have been held by Plaintiffs.

145. Defendants' actions were part of a pattern and practice of conduct.

146. Defendants knew that they had fiduciary duties by law and that they were breaching same for their own self-interest.

147. But for the actions and cooperation of the Defendants the diversion and taking of funds from the various Plaintiffs named herein could not have occurred.

148. Defendants actions constitute the tort of civil aiding and abetting.

WHEREFORE, Plaintiffs request that judgment be entered in their favor, and against these named Defendants, jointly, and severally, as follows:

A.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

22

B.      For punitive damages in an amount to be proven at trial;

C.      For Plaintiffs' costs and attorney's fees incurred herein; and

D.      For such other and further relief as the Court deems just and proper.

**COUNT SIXTEEN**

**CONSTRUCTIVE FRAUD: SINGLEPOINT, LAMBRECHT, RALSTON AND C. LAMBRECHT**

149. Plaintiffs reallege the allegations of paragraphs one-one hundred forty-eight (1-148) as if set forth in this Count Sixteen.

150. SinglePoint, Lambrecht, Ralston and C. Lambrecht were in a position of fiduciary duty and trust with Plaintiffs.

151. Lambrecht and Ralston were friends with Diaz prior to their acquisition of the DSA assets.

152. SinglePoint, Lambrecht, Ralston and C. Lambrecht falsely and deceptively promised funding to each of the Plaintiffs.

153. Each of the Plaintiffs justifiably relied on these false and deceptive representations and acted justifiably in accepting Defendants written and oral promises and agreements.

154. Defendants acts constitute the grounds for the imposition of a constructive trust on those assets taken from Plaintiffs and the proceeds and after-acquired property of those assets.

WHEREFORE, Plaintiffs request that judgment be entered in their favor, and against Defendants SinglePoint, Lambrecht, Ralston and C. Lambrecht, jointly and severally as follows:

A.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.      For punitive damages in an amount to be proven at trial;

C.      For plaintiffs' costs and attorney's fees incurred herein; and

D.      For such other and further relief as the Court deems just and proper

**COUNT SEVENTEEN**
**FRAUD**

**SINGLEPOINT, LAMBRECHT, RALSTON'S AND C. LAMBRECHT'S
INTENTIONAL AND KNOWING MISREPRESENTATIONS OF PROMISED
FUNDING FOR COMPANIES ACQUIRED**

155. Plaintiffs reallege the allegations of paragraphs one-one hundred fifty-four (1-154) as if set forth in this Count Sixteen which set forth with particularity the numerous instances of misrepresentations, deceptions and fraudulent acts, inducements and schemes perpetrated by Defendants.

156. In their Acquisitions of DSA, Jiffy Auto Glass, Shield Saver, and Sun Up Solar Defendants SinglePoint, Lambrecht and Ralston promised funding for expansion.

157. In each case the promised funding did not occur.

158. SinglePoint took the funds of the Company for its own purposes leaving the acquired company insolvent.

159. SinglePoint's, Lambrecht, Ralston and C. Lambrecht promise of funding were knowingly false.

160. Plaintiffs Diaz, Shikiar and Chaffino justifiably relied on this promise in deciding to sell a controlling interest of their companies to SinglePoint.

161. But SinglePoint did not fund the companies; rather, it took their available cash, e.g., taking Direct Solar's PPP funds and going to the Wells Fargo bank and taking all cash out of the Jiffy Auto Glass and ShieldSaver bank accounts

162. SinglePoint as the majority and controlling member of Direct Solar, Jiff Auto Glass and ShieldSaver failed to pay sales tax due, glass suppliers, other bills.

163. As a result not only did the Plaintiffs not get the promised funding, but their accounts were also drained causing great financial harm to the Plaintiffs and the companies were left insolvent and the Plaintiffs' interest therein worthless.

164. Defendants committed similar acts by filing false and perjurious documents with the

Arizona Corporation Commission and Plaintiffs' banks.  ARS £29-3502.D and ARS £13-2702. Perjury is a class 4 felony punishable by from 1-3.75 years imprisonment.

WHEREFORE, Plaintiffs request that judgment be entered in their favor, and against Defendants SinglePoint, Lambrecht, Ralston and C. Lambrecht, jointly and severally as follows:

A.    For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.    For punitive damages in an amount to be proven at trial;

C.    For plaintiffs' costs and attorney's fees incurred herein; and

D.    For such other and further relief as the Court deems just and proper.

**COUNT EIGHTEEN**
**RICO**

165. Plaintiffs incorporate the above factual allegations of paragraphs one-one hundred sixty-four (1-164) as if fully stated in this Count Eighteen.

166. Defendants have engaged in a pattern and practice of acquisitions based on false promises of funding while at the same time maneuvering to gain access and drain the acquisitions of monies in their bank accounts leaving the acquisitions insolvent.

167. Good companies have been ruined and their owners' finances and reputations seriously, if not irreparably injured, by Defendants actions.

168. Here we have at least the companies and their owners affected by Defendants' conduct as described with particularity in Counts One to Count Seventeen, Paragraph numbers 1 - 164 above.

169. Each of the injuries sustained by the Plaintiffs as a result of Defendants pattern of conduct was foreseeable to the Defendants

170. Each of the transactions involved the sale, purchase or exchange of an investment contract and security under Arizona law.

171. Thus, Plaintiffs have a private cause of action under A.R.S. § 13-2314.04 involving the

sale of securities pursuant to (A.R.S. § 44-1991) (the shares of stock or membership interests in the plaintiff companies are securities), intentional or reckless sale of unregistered securities or real property securities (A.R.S. § 44-1841), a scheme or artifice to defraud (A.R.S. § 13-2310).

WHEREFORE, Plaintiffs request that judgment be entered in their favor, and against Defendants SinglePoint, Lambrecht, Ralston and C. Lambrecht, jointly and severally as follows:

A.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.      For mandatory treble damages pursuant to A.R.S. £ 13-2314.04(A)(D);

C.      For plaintiffs' costs and attorney's fees incurred herein; and

D.      For such other and further relief as the Court deems just and proper

RESPECTFULLY SUBMITTED this 7th day of June, 2021.

**LAW OFFICES OF DONALD W. HUDSPETH, P.C.**

*Donald W. Hudspeth*
Donald W. Hudspeth, Esq.
***Attorneys for Plaintiff***